In the United States District Court
For the Northern District of Illinois
Eastern Division

| | |
|---|---|
| RANDALL METALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>PUROLATOR FILTERS NA, LLC,<br><br>Defendant. | FILED: JULY 2, 2008<br>08CV3782<br>JUDGE ANDERSEN<br>MAGISTRATE JUDGE SCHENKIER<br><br>PH |

# Complaint for Declaratory Judgment and Other Relief

Plaintiff Randall Metals Corporation complains of defendant Purolator Filters NA, LLC:

## Count I – Declaratory Judgment

### A. Jurisdiction and Venue

1. Jurisdiction for Count I is based on 28 U.S.C. § 1332(a), because the plaintiff and the defendant are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs, and the claim arises under 28 U.S.C. § 2201(a) to determine the parties' rights under their "Purchase and Sale Agreement." Jurisdiction for Count II is based on 28 U.S.C. § 1367, because its claim is so related to the claim under Count I that it forms part of the same case or controversy as Count I.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims alleged herein occurred in this District.

### B. The Parties

3. Randall Metals is an Illinois corporation with its principal place of business at 2483 Greenleaf Ave., Elk Grove Village, Illinois 60007. Randall Metals is a steel service center, specializing in the processing of flat-rolled steel products, which are incorporated into products made or partially made by its customers.

4752073_3

4. Purolator Filters is a North Carolina limited liability company with its principal office at 3200 Natal Road, Fayetteville, North Carolina 28306. Purolator Filters manufactures filters and related parts for automotive, light truck and heavy duty applications. It regularly sells its filters in Illinois and is generally doing business within Illinois.

### C. Purchase and Sale Agreement

5. Effective January 1, 2008, the parties entered into a one-year "Purchase and Sale Agreement," a genuine copy of which is attached as Exhibit A. The Agreement, which ends December 31, 2008 unless terminated earlier due to breach, requires Randall Metals to sell and deliver to Purolator Filters all of the latter's estimated requirements for goods specified in Exhibit A to the Purchase and Sale Agreement.

6. Section 4 of the Agreement, requires Purolator to pay Randall Metals a set sales price for the goods, plus applicable freight surcharges.

### D. Purolator's Breach of Purchase and Sale Agreement

7. During February 2008, Randall Metals invoiced Purolator Filters, pursuant to § 4 of the Agreement, $21,708 for applicable fuel surcharges incurred during January 2008.

8. Purolator has failed and refused to pay the fuel surcharges within 30 days after written notice of default from Randall Metals and attempts to settle the dispute through negotiation.

9. On July 2, 2008, Randall Metals notified Purolator Filters that the Agreement was terminated due to its failure to cure its default and that it would discontinue all further shipments of goods to it.

10. Through the date it terminated the Agreement, Randall Metals fully performed all of its obligations under it.

4752073_3

11. Purolator Filters disputes Randall Metals' termination of the Agreement and contends that Randall Metals is required to continue its performance pursuant to it.

12. Randall Metals' continued performance of the Agreement would require it to sell and deliver in excess of $15 million of goods to Purolator Filters or face potential liability and damages in excess of $75,000 if it were determined to have wrongfully terminated the Agreement.

THEREFORE, plaintiff Randall Metals prays for the Court to declare the rights of the parties, including that due to Purolator Filters' breach of the Purchase and Sale Agreement, Randall Metals is not required to continue to perform its obligations under the Agreement.

## Count II – Damages for Breach of Purchase and Sale Agreement

1-12. For ¶¶ 1-12 of Count II, Randall Metals repeats the preceding ¶¶ 1-10 of Count I.

13. Randall Metals has fully performed all of its obligations under the Agreement.

14. Pursuant to ¶ 4 of the Agreement, Purolator Filters currently owes Randall Metals $21,708 in fuel surcharges, which it has failed and refused to pay.

15. Randall Metals demand trial by jury as to all issues triable of right by a jury.

THEREFORE, plaintiff Randall Metals prays for all appropriate relief, including judgment for the amount defendant Purolator Filters has failed to pay, which is $21,708, plus any additional amounts that Purolator Filters fails to pay it.

RANDALL METALS CORPORATION

By: _s/ Arthur Sternberg_____
    One of Its Attorneys

Thompson Coburn LLP dba Thompson Coburn Fagel Haber
55 E. Monroe, 40th Floor
Chicago, IL 60603
(312) 580-2235

4752073_3

```
08CV3782
JUDGE ANDERSEN
MAGISTRATE JUDGE SCHENKIER

PH
```

# Exhibit A

**PURCHASE AND SALE AGREEMENT**

| Party | PUROLATOR NA LLC ("Buyer") | Randall | |
|---|---|---|---|
| Notice Address and Fax | 3200 Natal Road Fayetteville, NC 28306 Michael Sommerlad Fax: 910-426-9953 | 2483 Greenleaf Avenue Elk Grove Village, IL 60007 Laurens W. Leffingwell | |
| State organized | North Carolina | Illinois | |
| corporation/LLC | LLC | Corporation | |
| Effective Date | January 1, 2008 | | |
| Expiration Date | December 31, 2008 | | |

1. **Term.** This Agreement shall commence on the Effective Date and expire on the Expiration Date, unless terminated earlier as provided in this Agreement.

2. **Goods.** The goods subject to this Agreement are those listed on Exhibit A ("Goods"), which may be modified from time to time by written agreement of Buyer and Seller.

3. **Quantity.** Buyer agrees to purchase from Seller and, subject to establishing and maintaining Seller's credit approval, Seller agrees to sell to Buyer, the following quantity of Goods for the locations listed:

| Quantity | Buyer's Location(s): |
|---|---|
| See Exhibit A | |

4. **Price; Price Adjustment.** The prices of the Goods are specified on Exhibit A. All prices include Exworks freight from Randall's facility in Salisbury, NC. If Buyer requests expedited delivery, Buyer shall pay for such expedited freight, unless it is due to Seller's late delivery, in which case Seller shall pay. Prices for the Goods shall be adjusted as described on Exhibit A, plus applicable freight surcharge shall be added. USS Logistics Services.com (Category Fuel Service Charge)

5. **Payment Terms.** Net 30th Ultimo and special

6. **Inventory.** PFNA and Randall agree to hold a minimum of 2 weeks finished and up to 75 days of raw/inventory master coil orders and adequate lead time with mill orders to ensure weekly, monthly, and annual volumes.

7. **Title, Risk of Loss and Insurance.** Title, risk of loss and responsibility to obtain insurance for the Goods shall pass from Seller to Buyer at Buyer's facility if Seller designates the carrier and at Seller's shipping dock if Buyer designates the carrier or picks up the Goods at Seller's facility.

8. **Warranty.** Seller warrants to Buyer that, at the time of delivery: (i) the Goods conform to the specifications agreed to in writing by Buyer and Seller, and (ii) the Goods are free of all lawful liens and encumbrances. THIS IS THE EXCLUSIVE WARRANTY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE DISCLAIMED.

9. **Inspection; Non-Conforming Goods.** Buyer shall have the right to inspect, accept or reject the Goods within thirty (30) days of delivery, irrespective of whether Buyer has already acknowledged receipt or paid for the Goods. Buyer shall give Seller notice of any non-conforming Goods within thirty (30) days of receipt at its facility and shall set aside such Goods for Seller's inspection for a period of ten (10) business days after notice to Seller. If the Goods are determined to be non-conforming by Buyer and Seller, Seller shall either: (a) refund the portion of the purchase price paid with respect to such non-conforming Goods, or (b) replace the non-conforming Goods with conforming Goods. If no rejection has been made within such 30-day period, Buyer shall be deemed to have finally and unconditionally accepted the Goods.

**10. Termination.** Either party may terminate this Agreement if the other party fails to cure any default in the performance of any covenant or obligation under this Agreement within thirty (30) days after written notice. This Agreement will terminate immediately and automatically if either party files a voluntary petition in bankruptcy, or enters into an arrangement with its creditors, or applies for consents to the appointment, or suffers or permits the entry of an order adjudicating it to be bankrupt or insolvent.

Seller shall offer Products on Exhibit A for sale at terms and conditions at least as favorable as those offered to Buyer by other qualified suppliers. Should Buyer determine that Seller has failed to maintain, competitiveness with respect to cost, quality, delivery or technology of any Product on Exhibit A that is sold by a competitor in a substantially the same quantities purchased by Buyer from Seller, then Buyer and Seller shall review the situation within 30 days of notification by Buyer In the event that Seller is unable to reach agreement to become competitive in the deficient area within 45 days of notification by Buyer. Then Buyer shall have the right to terminate all or any part of this Agreement. The Buyer will not be responsible for more than 75 days of total days of order from notifications.

**11. Intellectual Property Ownership.** It is not the intent of this Agreement to provide for joint developments and any such joint developments, if they are to occur, will be reflected in a separate agreement signed by the parties. All inventions, whether patentable or not, made during the term of this Agreement shall be owned by Buyer if made by an employee of Buyer; and shall be owned by Seller if made by an employee of Seller. Nothing in this Agreement shall be construed as conferring on the receiving party by implication, estoppel, or otherwise, any right, title or interest in, or any license under, any patent, trademark, copyright, trade secret or confidential information now or subsequently owned by the disclosing party.

**12. Indemnification.**

  a. <u>Mutual Indemnification</u>. Seller and Buyer ("Indemnitor") each agrees to indemnify and hold the other, and its respective parent company, affiliates, agents, employees, officers, directors, successors, and assigns ("Indemnitee") harmless, against any and all third-party claims, damages, fines, penalties, costs, liabilities or losses (including sums paid in settlement of claims, reasonable attorneys' fees, consultant fees, expert fees and costs) ("Claim") arising out of its negligence or other tortuous fault, including that of its officers, employees, contractors, agents and subcontractors, or arising out of its infringement of any patents, copyrights, trade secrets or similar intellectual property rights covering the Goods furnished hereunder by such party, except that no right of indemnity shall exist in that portion of such Claim resulting from the negligence or tortuous fault of Indemnitee, its officers, employees, contractors, agents and subcontractors, or if the Indemnitor has relied on the express written approval, acceptance or instructions of Indemnitee with respect to the act or omission giving rise to the Claim.

  b. <u>Procedure</u>. Indemnitee shall, within ten (10) calendar days after receipt of notice of the commencement of any third party Claim against Indemnitee, for which indemnity may be sought, notify Indemnitor; provided, however, that the failure to provide such notice shall not relieve Indemnitor of its indemnity obligations, unless the Indemnitor is prejudiced by such delay. Indemnitor shall, upon Indemnitor's request, be entitled, at its own expense, to assume the defense of any such Claim with reputable counsel reasonably acceptable to Indemnitee. Indemnitor shall be entitled to settle any such Claim without Indemnitee's written consent if the settlement is only for money damages and the Indemnitor pays the damages and does not admit fault upon Indemnitee, but shall otherwise require Indemnitee's consent, which may be granted or withheld in Indemnitee's reasonable discretion. Indemnitee, at Indemnitor's cost, shall reasonably cooperate with Indemnitor in the defense of such Claim as Indemnitor may reasonably request. Upon the institution of any Claim alleging infringement against Buyer relating to Seller's intellectual property, Seller may, at its option but without obligation to do so: (i) procure the right to continue using the Goods, (ii) replace the Goods with non-infringing Goods, or (iii)

modify the Goods so they becomes non-infringing. This indemnity obligation shall survive the expiration, termination, or cancellation of this Agreement.

**13. Limitation on Liability; No Intended Third-Party Beneficiaries.** NEITHER BUYER NOR SELLER SHALL BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES WITH RESPECT TO DIRECT CLAIMS MADE BY THE OTHER PARTY WHETHER IN TORT, CONTRACT, BREACH OF THIS AGREEMENT OR ANY WARRANTY OR ANY OTHER THEORY. THIS LIMITATION SHALL NOT APPLY TO THE PARTIES' INDEMNIFICATION OBLIGATIONS RELATING TO THIRD PARTY CLAIMS. THERE ARE NO INTENDED THIRD-PARTY BENEFICIARIES OF THIS AGREEMENT.

**14. Excused Non-Performance.** Except for the obligation to timely pay amounts due, neither party will be liable for failure to carry out its obligations under this Agreement in whole or in part when such failure is due to acts of God, weather, fire, natural disaster, explosion, strikes, labor disputes, failures or delays in transportation, civil disturbance, judicial acts or acts of a government agency, or circumstances beyond a party's reasonable control.

**15. Confidentiality.** Confidential Information ("Confidential Information") shall be limited to the terms of this Agreement and any information disclosed to the receiving party by the disclosing party in writing or other tangible form and marked "Confidential" or, if orally or visually disclosed, confirmed in writing as being confidential within thirty (30) days after the oral or visual disclosure. For a period of three (3) years from the date of disclosure the receiving party shall keep the disclosing party's Confidential Information in confidence and shall disclose such Confidential Information to its employees, representatives and agents only on a need to know basis and who must be subject to the confidentiality obligations herein. Each party further agrees, except as required by law, not to disclose such Confidential Information to any third party without the prior consent of the disclosing party. Confidential Information subject to the restriction of this Agreement shall not include (i) information already in the possession of the receiving party as evidenced by the receiving party's prior written records, (ii) information disclosed to the receiving party by a third party entitled to make such disclosure, (iii) information which becomes public through no fault of the receiving party, (iv) information developed independently by the receiving party, or (v) information required to be disclosed pursuant to a subpoena or court order or by law, provided, however, that to the extent not prohibited the receiving party shall provide reasonable prior notice to the disclosing party such that the disclosing party may seek an order preventing such disclosure.

**16. Assignment; Subcontractors.** Except for a transfer to an entity under common control with a party to this Agreement, neither party may assign all or a part of this Agreement to any third party voluntarily or by operation of law without the prior written consent of the other party, which consent shall not be unreasonably withheld, and any other attempted assignment or transfer shall be void. Notwithstanding the foregoing, if a transaction involving any change of control or sale of substantially all of the operations or assets of either party or a major operating division of a party, whether by merger, sale of stock, assets or operations, joint venture or otherwise, the rights and obligations under this Agreement may be assigned to and assumed by the successor. Each party is fully responsible for the conduct of its contractors, subcontractors and agents.

**17. Dispute Resolution; Governing Law.** If a dispute arises, the parties will attempt to settle it through negotiation. Only if the parties are unable to reach a settlement through negotiation after at least ten (10) days may suit be filed in the state and federal courts of the state in which title passes, provided that such 10-day period shall not apply if it would cause the statute of limitations to expire. This Agreement shall be interpreted, construed and governed by the laws of the state in which title passes.

3

**19. Approval of New Raw Material Sources, Mills, and/or Processing (for steel).** Both parties agree to work together to mutually develop new lower cost sources of supply and expeditiously evaluate and approve where possible sources which meet the quality requirements. Savings from new sources will be passed on to the Buyer in order to offset dramatic price increases incurred.

**20. Design.** Buyer has right to eliminate or reduce supply due to the elimination, reduction, or replacement of tinplate in Purolator designed products without penalty. Buyer will work to advise Seller with as much notice as possible (target 90 days or more) of impending changes to regular supply, Buyer will commit to using any remaining inventory of the items that are eliminated, subject to best effort on the part of Seller to cancel existing orders.

**21. United Tool.** Seller will extend terms of purchase prices for exact parts in schedule A or similar families of parts to United Tool and Stamping of Fayetteville, NC as a tier supplier to Purolator.

| Purolator Filter LLC | Randall Metals |
|---|---|
| Signature: *ME Sommerled* | Signature: *[signed]* |
| Print Name: MICHAEL SOMMERLAD | Print Name: Laurens K. Leffingwell |
| Print Title: Dir of Purchasing | Print Title: CEO |

**EXHIBIT A**

4

| PUROLATOR PRODUCTS | | | REVISED | |
|---|---|---|---|---|
| PART # | DESCRIPTION / SIZE | *ANNUAL VOLUME | PRICE CWT | |
| | ETP TYPE D T2 .10#  5C MATTE | | | Formatted Table |
| R013902 | 128# X 33.250 X COIL | 1.0 MM LBS | 52.75 | Formatted: German (Germany) |
| R013903 | 128# X 29.500 X COIL | 3.4 MM LBS | 53.20 | |
| R013904 | 128# X 31.875 X COIL | 660 M LBS | 52.75 | |
| R013905 | 128# X 28.000 X COIL | 4.9 MM LBS | 54.25 | |
| | ETP TYPE D T1 .10# 5C MATTE | | | Formatted: German (Germany) |
| R024501 | 118# X 29.500 X COIL | 3.5MM LBS | 53.75 | |
| R024502 | 118# X 31.875 X COIL | 1.3MM LBS | 53.35 | |
| R024503 | 118# X 33.250 X COIL | 2.7MM LBS | 53.35 | |
| R088800 | .0105 X VARIOUS ETP .10# T4 | | 60.90 | |
| R090000 | 90# (.0099) ETP .10# T3 | | 61.90 | |
| M126800 | .007 ETP T3/T4 .10# MIN | | 77.50 | |

\* Estimated annual volume⁶ - not a guarantee

**NOTE: PRICES DO NOT INCLUDE FUEL SURCHARGE TO BE DETERMINED MONTHLY.**

*Annual volumes are an estimate on the part of the Buyer. Quantity is determined by logistics release.